## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BLUE RIDER FINANCE, INC. | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Case No. 11-3101 |
| HARBOR BANK MARYLAND; | * | |
| RODNEY DUNN; | | |
| DARRYL BANKS; | * | |
| RENEE CANNAN | | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

Plaintiff Blue Rider Finance, Inc. ("BRF" or "Plaintiff") alleges for its Complaint against defendants Harbor Bank Maryland ("Harbor"), Rodney Dunn ("Dunn"), Darryl Banks ("Banks") and Renee Cannan ("Cannan").  BRF further states as follows:

## INTRODUCTION

BRF has suffered damages because of the fraud, negligence and negligent misrepresentations of Harbor and its officers Dunn, Banks and Cannan, and the negligent supervision over and retention by Harbor of its employees Dunn, Banks and Cannan.

BRF is in the business of providing short term financing (or bridge loans) to film producers so that producers can, among other things, secure the acting talent necessary to close permanent financing for a picture.  Since 1998, BRF has extended bridge financing to more than 100 films with production budgets totaling $687 million.  BRF enjoys a strong reputation in the film industry as a credible source of short term bridge and collateral enhancement financing.

This case involves the financing of a motion picture tentatively entitled *Season Tickets* that was purported to star Martin Lawrence and Zach Galifianakis.  The producer of *Season*

*Tickets*, CityScope Productions, LLC ("City"), an Illinois limited liability company, set a $13 million budget for the film. Of this total amount, $8 million was to be provided by a company identified as Bridge Capital Corporation ("BCC"), a Michigan corporation, and another $5 million was to be provided by an entity identified as the Shah Group LLC ("Shah"), a Michigan limited liability company. BRF was asked to provide an initial $2.5 million bridge loan for a short 45 day period to be repaid with fees and costs and to be secured by two escrow accounts – relating to BCC and Shah – that were purported to exist at Harbor.

In reality, there were no escrow accounts at Harbor although Harbor made repeated misrepresentations affirming their existence. BRF brings this lawsuit against Harbor because Harbor falsely told BRF that Shah and BCC had escrowed their respective $5 million and $8 million investments at Harbor. The existence of escrow accounts under escrow account agreements executed by City, BRF, Harbor and either Shah or BCC, respectively, was a condition precedent to the closing of BRF's $2.5 bridge loan. During the course of several months, BRF had repeated communications with Harbor and its employees relating to these escrow accounts and, in response, received communications, verbal and written, that were false and untrue. As a result of these misrepresentations, BRF funded its bridge loan commitment, but then suffered damages, including a loss of much of the $2.5 million bridge loan as well as interest and fees to which it is entitled.

BRF brings this lawsuit against Dunn, Banks and Cannan because they are employees and officers of Harbor and each acted to perpetuate this fraud. Dunn, in particular, made repeated false statements relating to the existence of the escrow accounts and had an undisclosed relationship with one of the entities, BCC. Banks and Cannan have covered for Dunn, contributing to this conspiracy. In addition to this fraud, Harbor has acted negligently in its misrepresentations and its supervision and retention of its employees, Dunn, Banks and Cannan.

BRF further states as follows:

## PARTIES

1. Plaintiff BRF is a finance company incorporated and doing business in the State of California.  BRF's principal office is in Santa Monica, California, County of Los Angeles.

2. Defendant Harbor is a subsidiary of Harbor Bankshares Corporation, a Maryland corporation.  Harbor is a bank with offices in Maryland and with a main office located at 25 West Fayette Street, Baltimore Maryland 21201.

3. Defendant Dunn is an employee of and, upon information and belief, a vice president of Harbor Bank.  Dunn is assigned to work out of Harbor Bank's Riverdale Branch (the "Riverdale Branch") located at 6820 Riverdale Road, Riverdale Maryland 20737. Dunn's personal address is 4869 Royal Coachman Drive, Elkridge Maryland 21075.

4. Defendant Banks is a vice president of Harbor Bank and the branch manager of the Riverdale Branch.  Banks is a supervisor of Dunn.

5. Defendant Cannan is a vice president of Harbor Bank and the assistant branch manager of the Riverdale Branch.  Cannan is a supervisor of Dunn.

## JURISDICTION

6. Plaintiff BRF is a California corporation doing business in California with its sole place of business in Santa Monica, California.

7. Defendants Harbor, Dunn, Banks and Cannan (collectively, "Defendants") are all residents of Maryland.

8. This cause of action relates to fraud and negligence-based theories of liability concerning a $2.5 million bridge loan made by BRF based on the misrepresentations made by Defendants.  BRF is owed principal from this loan in excess of $75,000 plus fees and interest and seeks additional damages, including punitive damages. Accordingly, this Court maintains diversity of citizenship jurisdiction under 28 U.S.C. § 1332.

WCSR   7006423v8

## FACTUAL ALLEGATIONS

### *Harbors' Prior Experience with the* Season Tickets *Financing Deal*

9.  In the spring of 2011, a production company identified as CityScope Productions, LLC ("City") was seeking a bridge loan to make a film titled *Season Tickets*.  City is an Illinois limited liability company controlled by David Odom ("Odom") and acts as a producer for films.

10.  *Season Tickets* was purported to have cast Martin Lawrence and Zach Galifianakis in leading roles.

11.  City negotiated with a producer and a bridge lender located in the United Kingdom (the "U.K. Investor") to provide a bridge loan to *Season Tickets*.

12.  City informed the U.K. Investor that it needed short term financing to cast talent, but had permanent financing in place from BCC and Shah.  The U.K. Investor was also told by City that BCC and Shah both had escrow agreements in place at Harbor to finalize the *Season Tickets* deal.

13.  Likewise, Harbor told the U.K. Investor that it had accounts for City, BCC and Shah. Dunn, in particular, communicated to the U.K. Investor and her attorneys that an escrow was in place for both Shah and BCC.  These communications occurred in March and April, 2011.   In addition, the U.K. Investor was given a false letter of credit from Harbor.

14.  After the U.K. Investor discovered the letter of credit was fraudulent in April 2011, the U.K. Investor then discovered that there were no escrow agreements at Harbor for City and Shah.

15.  The U.K. Investor through her attorneys communicated to Harbor that she suspected fraud on the part of Harbor and its employees, particularly Dunn.   These communications were not answered by Harbor.   As a result of these irregularities, the U.K. Investor declined to invest in *Season Tickets*.

16.  Communications regarding the fraud on the part of at least some Harbor employees, including Dunn, were made by the U.K. Investor's attorneys to Darius L. Davis

4

("Davis"), Executive Vice President and Chief Operating Officer of Harbor. Specifically, Davis was told by the attorneys for the U.K. Investor that they had received a fraudulent letter of credit from Harbor. This information was also relayed to Joseph Haskins, Jr. ("Haskins"), President of Harbor. Davis and Haskins did nothing to confront, address or remedy this fraud except communicate to the U.K. Investor's attorneys that they appreciated being made aware of it.

17. From at least April 9, 2009 forward, Harbor knew that certain employees of Harbor, like Dunn, were falsifying escrow information with respect to agreements involving City, BCC and Shah and that there were irregularities in letters of credit and other documents generated by Dunn at Harbor. Harbor failed to do anything to keep agents of Harbor from committing this fraud even after Harbor obtained actual knowledge of it.

### BRF's Experience with Harbor

18. After City's failed experience with the U.K. Investor, City sought other sources of bridge funding for *Season Tickets*.

19. In mid-April 2009, agents for City, namely Odom and Mark Campbell ("Campbell"), approached BRF about providing bridge funding for *Season Tickets*. Upon information and belief, agents of Harbor, including Dunn, were involved with this initial approach to BRF.

20. No one from City or Harbor made BRF aware of the U.K. Investor's prior experience with City and Harbor. BRF was unaware of the experience that the U.K. Investor had with City and Harbor.

21. After several preliminary conversations, BRF indicated that it was interested in considering a bridge loan to City for production of *Season Tickets*, based on City's initial representation that funds in the amount of $13,000,000 had been deposited in two escrow accounts at Harbor for purposes of covering the production costs and securing the bridge loan.

22. Specifically, City represented that $8 million had been deposited in an account belonging to BCC (the "BCC Escrow Account"). City further represented that $5 million had been deposited in an account belonging to Shah (the "Shah Escrow Account"). These funds were to be made available as collateral to secure repayment of all obligations under the BRF bridge loan to City in the amount of $2.5 million plus fees and costs.

23. City also produced two escrow agreements governing the BCC Escrow Account and the Shah Escrow account. These were the same escrow agreements drafted with Harbor and Dunn's assistance for the U.K. Investor. Odom told BRF that the deal with the U.K. Investor did not close because it was taking too long to close. Odom did not tell BRF that the U.K. Investor's attorneys had reported the fraudulent generation of documents to the top officers of Harbor, and BRF was entirely unaware of the communications between the U.K. Investor's attorneys and Harbor. Because these escrow agreements were deemed inadequate by counsel to BRF, City and BRF drafted amended escrow agreements, which Harbor approved.

24. The first amended escrow agreement, dated May 1, 2011, is titled "Amended BCC Escrow Agreement." *See* Exhibit A. The Amended BCC Escrow Agreement states that, as of May 1, 2011, $8 million had been placed in the BCC Escrow Account and would be released if within 45 days drawing documents confirming that certain producer and director agreements had been concluded were presented to Harbor.

25. The BCC Escrow Account identifies Harbor as the bank holding and acting as custodian of the BCC Escrow Account. The BCC Escrow Account is signed for Harbor by Dunn who is identified as a Harbor vice president.

26. The second amended escrow agreement, also dated May 1, 2011, is titled "Amended Shah Escrow Agreement." *See* Exhibit B. The Amended Shah Escrow Agreement states that, as of May 1, 2011, $5 million had been placed in the Shah Escrow Account and would be released within 45 days after BRF advanced the $2.5 million

WCSR  7006423v8

bridge loan if the bridge loan had not been previously repaid from the BCC escrow or otherwise.

27. The Shah Escrow Account identifies Harbor as the bank holding and acting as custodian of the BCC Escrow Account. The Shah Escrow Account is signed by Dunn who is identified as a Harbor vice president.

28. In May 2011, BRF and Dunn had conversations regarding the Amended BCC Escrow Agreement and the Amended Shah Escrow Agreement. Dunn confirmed the existence of these agreements, verbally and in writing, and confirmed that Harbor was holding escrow accounts opened by BCC and Shah.

29. In addition, on May 6, 2011, Dunn generated an "Available Funds Verification" on Harbor stationary. *See* Exhibit C. The Available Funds Verification states that Shah has $5,123,784.23 in an account at Harbor. It is signed by Dunn on a signature line which identifies him as a Harbor vice president. *Id.* This document was presented to BRF.

30. On May 9, 2011, Dunn generated an "Available Funds Verification" on Harbor stationary. *See* Exhibit D. The Available Funds Verification states that BCC has $8,006,668.05 in an account at Harbor. It is signed by Dunn on a signature line which identifies him as a Harbor vice president. *Id.* This document was also presented to BRF.

31. The Amended BCC Escrow Agreement, Amended Shah Escrow Agreement and the Available Funds Verifications for Shah and BCC were false and untrue. In reality, neither BCC nor Shah had accounts at Harbor and there were no escrow accounts in their names.

32. Dunn made additional oral representations over the phone to BRF that the BCC and Shah escrow accounts existed and were in place. These representations by Dunn were also made to BRF's officers, attorneys, bankers and other interested third parties. They were frequently made from Dunn's office in the Riverdale Branch of Harbor using the Harbor phone line. In particular a loan officer of BRF's banker at

City National Bank in Los Angeles California had a telephone conversation with Dunn who confirmed the existence of the actually non-existent escrow accounts, as well as the non-existent account balances.

33. Based primarily on these representations by Dunn and Harbor, BRF instructed on or about May 9, 2011 that a wire of $2.5 million be sent to City at the following account and coordinates:

| | |
|---|---|
| *ACCOUNT NUMBER:* | *2153 118 738* |
| *ACCOUNT NAME:* | *CityScope Productions, LLC* |
| *ABA NUMBER:* | *075 900 575* |
| *BANK NAME:* | *Associated Bank* |
| *BANK ADDRESS:* | *1901 Douglas Road* |
| | *Montgomery, Illinois 60538-2470* |

34. Under its agreement with City, BRF was first to be repaid from first the BCC escrow account. If the bridge loan had not been repaid by the BCC escrow then money would be drawn from the Shah escrow account. BRF was to be fully repaid within forty-five (45) days of the date of funding – on or by June 24, 2011.

35. During the period after funding of the BRF bridge loan to the time of repayment from either the non-existent BCC Escrow Account or the non-existent Shah Escrow Account, BRF became suspicious of the validity of these accounts. At various points in time, BRF had discussions with different employees of Harbor, including Dunn, Banks and Cannan. Banks identified himself to BRF as Dunn's superior and confirmed that Dunn had authority to discuss Harbor accounts. Cannan likewise directed calls to Dunn and confirmed his authority to discuss the escrow accounts. Both Banks and Cannan were present when Dunn gave BRF false information relating to the BCC Escrow Account and Shah Escrow Account. Upon information

WCSR   7006423v8

and belief, Banks and Cannan covered for Dunn and enabled him to provide false and untrue information.

36. BRF's suspicion resulted in a request by BRF to Harbor to confirm the amounts in the Shah Escrow Account and the BCC Escrow Account. Bryan Castillo, an officer of BRF, faxed a copy of this request to Cannan at Harbor. Cannan confirmed receipt thereof, and advised she had turned the fax over the Dunn. Castillo also emailed a request to Dunn which referenced the fax. *See* Exhibit E.

37. On June 16, 2011, Dunn replied by e-mail stating that "As of June 16, 2011 the balance in account 117688765 (Bridge Capital Corporation) is $8,010,004.10, and the balance in the account 1176844253 (The Shah Group LLC) is $5,125,919.09." *See* Exhibit F.

38. This statement by Harbor was false and untrue. There were no escrow accounts for BCC and Shah.

39. On the forty-fifth (45th) day, neither the BCC escrow agreement nor the Shah escrow agreement was honored by Harbor. On or about June 24, 2011, a drawing document under the Amended Shah Escrow Agreement was presented to Dunn by BRF by email. This drawing document solely required the passage of 45 days from funding of the bridge loan and no other conditions. BRF waited for the transfers, which Dunn not only advised had been sent, but provided the wire confirmation particulars as well. No money ever hit BRF's account, the only account listed on the relevant drawing certificate.

40. After the repayment funds failed to materialize, BRF contacted Banks, Dunn's superior, by phone. Banks finally advised that the BCC Escrow Account and the Shah Escrow Account numbers did not exist at his bank, notwithstanding numerous prior oral and written confirmations of their existence made to City National Bank and BRF. Banks provided no explanation as to why he did not provide this information sooner or why Dunn was allowed to make these misrepresentations to BRF. Two more attempts were made by phone to discuss the matter with Banks. On both

occasions, when BRF identified itself, Banks hung up. A further call to his office affected a transfer to a man, who purported to be Dunn, though his voice was vastly different, and this man advised he'd never heard of BRF, or any *Season Tickets* escrow transactions, and maybe they'd been dealing with another Dunn at Harbor.

41. A follow-up call was made to Dunn at the Riverdale Branch, and though Dunn was not there, the voice on Dunn's Harbor's answering service was the Dunn voice everyone had been listening to for over a month.

42. BRF escalated this issue to Harbor, but Harbor has failed to respond to BRF's inquiries.

43. After suing City and agents of City in state courts in California and Illinois, BRF was repaid part of the $2.5 million that it had wired to Odom and City.   Based on BRF's discussions with agents of City, BRF believes that Dunn has or had a business relationship with City, Odom, BCC and Links Resource Partners, LLC ("Links"), a BCC affiliate which manages accounts for BCC.   Dunn's latest cell phone identification is a Links' identification. Dunn's business relationships to Links, BCC and City were not disclosed to BRF prior to its agreeing to have Harbor serve as the bank for holding escrow and to funding the bridge loan.   BRF is still owed principal, interest and fees, in excess of $2.0 million.

44. At all times during its dealings with Harbor, BRF acted with diligence and reasonable care.   These acts of diligence included but were not limited to, calling Harbor's branch office in Riverdale and speaking to Harbor employees (including Dunn, Banks and Cannan) to confirm the existence and amounts in the BCC and Shah escrow accounts, faxing documents to Harbor's offices related to these alleged accounts and e-mailing Harbor directly to confirm the existence and amounts in these supposed accounts.

45. Dunn, Banks and Cannan acted together in a conspiracy to keep BRF from learning that Harbor did not maintain escrow accounts for BCC and Shah.

46. In addition, more senior Harbor officers, like Davis and Haskins, failed to act upon information provided to them as early as April 9, 2011 that employees of Harbor, like Dunn, were falsely representing the existence of these escrow accounts and producing fraudulent documents (like the letter of credit given to the U.K. Investor).

## FIRST CAUSE OF ACTION
## (Fraud Against All Defendants)

47. BRF incorporates all the allegations set forth in Paragraphs 1 though 46 hereof.

48. Defendants made fraudulent representations to BRF to cause BRF to advance to City the amount of $2.5 million. Among the representations were those set forth in the Amended BCC Escrow Agreement and the Amended Shah Escrow Agreement, specifically that the funds were in the escrow accounts at the Harbor, Harbor owned the money, the money could not be withdrawn, and the money would be paid out according to each escrow accounts' drawing document.

49. Defendants, individually and collectively, as part of a fraudulent conspiracy, effected fraudulent representations to BRF to cause BRF to enter into the Amended BCC Escrow Agreement and the Amended Shah Escrow Agreement, plus the Shah Guaranty and Defendants individually and collectively, had no intent to perform under the abovementioned agreements, or in the case of individual defendants, to cause performance.

50. At all times Defendants knew that BRF would not affect its bridge loan without the effective execution by all parties of the Amended BCC Escrow Agreement and the Amended Shah Escrow Agreement.

51. At the time of each and every representation made by Defendants to BRF, Defendants, and each of them, knew their representations to be false, knew that the Amended BCC Escrow Agreement and the Amended Shah Escrow Agreement would not be honored and were, in fact, bogus agreements, and knew that their intent was to

11

defraud BRF of the amount of $2.5 million or part thereof, and/or had other motives not yet determined.

52. BRF relied on the false representations made by all Defendants, and relied upon the executed Amended BCC Escrow Agreement and the Amended Shah Escrow.

53. BRF's reliance was justified in that it performed reasonable due diligence on every party to the transaction and the transaction documents and reviewed extensive material as to Harbor's bona fides. The Amended BCC Escrow Agreement and the Amended Shah Escrow Agreement were signed by Harbor through Dunn. Further, the prime party, the escrow agent, Harbor, which signed the escrow documents, is a licensed bank in the State of Maryland.

54. Defendants acted with actual malice and oppression and with a conscious intent to defraud.   As a result, Defendants should be punished with an award of punitive damages.

55. Dunn, Banks and Cannan all made their misrepresentations to BRF as part of their job responsibilities at Harbor and within the scope of their employment.   All of the communications made by and actions performed by Dunn, Banks and Cannan were within the scope of their job responsibilities at the Riverdale Branch of Harbor. Accordingly, Harbor is liable not just directly, but under a theory of respondeat superior.

56. BRF has suffered actual damages in the form of the unpaid bridge loan, as well as interest and fees.

## SECOND CAUSE OF ACTION

### (Negligence Against All Defendants)

57. BRF incorporates all the allegations set forth in Paragraphs 1 though 56 hereof.

58. As the escrow agent to BRF, Defendants had a duty of care to act as a reasonable and prudent banker in the handling of escrows.

WCSR  7006423v8

59. Defendants failed to exercise this duty of care in the manner in which they handled their relationship with BRF.

60. Defendants failed to exercise this duty of care in failing to respond to information provided by the U.K. Investor that agents, employees and/or officers of Harbor were committing fraud.

61. Defendants failed to exercise this duty of care in providing to Harbor materially false information relating to the existence and purported amounts of these non-existent escrow accounts.

62. BRF acted with diligence and reasonable care in dealing with Harbor.  These acts of diligence included but were not limited to, calling Harbor's branch office in Riverdale and speaking to Harbor employees (including Dunn, Banks and Cannan) to confirm the existence and amounts of the BCC and Shah accounts, faxing documents to Harbor's offices related to these alleged accounts and e-mailing Harbor directly to confirm the existence and amounts in these supposed accounts.  BRF also relied upon Harbor's balance sheet and public disclosures.

63. BRF justifiably relied upon the misrepresentations made by the Defendants.

64. BRF has suffered harm and damages as a direct and proximate result of Defendants failure to exercise the requisite care.

## THIRD CAUSE OF ACTION

### (Negligent Misrepresentations Against All Defendants)

65. BRF incorporates all the allegations set forth in Paragraphs 1 though 64 hereof.

66. Defendants had a duty to BRF to use ordinary and reasonable care in their making of statements because of its relationship as escrow agent to BRF.

67. Defendants failed to exercise that reasonable care in its making of statements concerning the Shah Escrow and BCC Escrow.

13

68. Defendants failed to exercise this duty of care in failing to respond to information provided by the U.K. Investor that agents, employees/ officers of Harbor were committing fraud.

69. Defendants failed to exercise this duty of care in providing to BRF materially false information relating to the existence and purported amounts of these non-existent escrow accounts.

70. Defendants acted with diligence in its dealings with Harbor, BRF acted with diligence and reasonable care. These acts of diligence included but were not limited to, calling Harbor's branch office in Riverdale and speaking to Harbor employees (including Dunn, Banks and Cannan) to confirm the existence and amounts of the BCC and Shah accounts, faxing documents to Harbor's offices related to these alleged accounts and e-mailing Harbor directly to confirm the existence and amounts in these supposed accounts.

71. BRF justifiably relied upon the misrepresentations made by the Defendants.

72. BRF has suffered harm and damages as a direct and proximate result of Defendants failure to exercise the requisite care.

## FOURTH CAUSE OF ACTION

### (Negligent Retention and Supervision Against Harbor)

73. BRF incorporates all the allegations set forth in Paragraphs 1 though 72 hereof.

74. Harbor had a duty to use reasonable care in its supervising of Dunn, Banks and Cannan.

75. Harbor failed to exercise this reasonable care, allowing Dunn, Banks and Cannan to make false, misleading, negligent and untrue statements relating to the existence of certain customer accounts.

76. Harbor had actual knowledge as early as April 9, 2011 that employees at the Riverdale branch were making false statements based on Harbor's experience with the U.K. Investor.

77. BRF has suffered harm and damages as a direct and proximate result of HBR's failure to exercise the requisite care in the supervision of Dunn, Banks and Cannan.

WHEREFORE, BRF requests an award of actual damages in excess of $2 million, as well as interest, costs, punitive damages and any other relief that this Court deems appropriate.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, BRF demands a trial by jury.

Respectfully submitted,

David B. Hamilton, Esq. (Fed Bar No. 04308)
Robert A. Gaumont, Esq. (Fed Bar No. 26302)
Womble Carlyle Sandridge & Rice, PLLC
250 W. Pratt Street, Suite 1300
Baltimore, Maryland 21201
Phone: (410) 545-5800
Facsimile: (410) 545-5801

*Counsel for Plaintiff Blue Rider Finance, Inc.*

WCSR  7006423v8