IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BLUE RIDER FINANCE, INC.,

    *Plaintiff*,

    v.

HARBOR BANK MARYLAND and
RODNEY DUNN,

    *Defendants*.

Civil Action No. ELH-11-3101

**MEMORANDUM OPINION**

Plaintiff Blue Rider Finance, Inc. ("Blue Rider"), a film production financing company, has sued defendants Harbor Bank Maryland ("Harbor Bank") and Rodney Dunn, a former Harbor Bank Vice President. The suit arises from Blue Rider's short-term $2.5 million loan in April 2011 to CityScope Productions ("CityScope"), a film production company, to finance CityScope's production of a motion picture. As security for the loan, Blue Rider relied on two supposed escrow accounts held at Harbor Bank, in the combined amount of $13 million. Blue Rider claims that it believed the escrow accounts existed because Dunn repeatedly informed Blue Rider, orally and in writing, that they did, and provided documentation purporting to establish the escrow funds' existence and Blue Rider's security interest in the funds. However, plaintiff alleges that Dunn's representations were false, the escrow funds did not actually exist, CityScope has not repaid the loan, and Blue Rider has lost over $2 million in the transaction.[1]

---

[1] CityScope is not a party to this case. But, plaintiff alleges that CityScope and its agents were co-conspirators with Dunn in the alleged fraudulent scheme. Plaintiff has sued CityScope and its agents in state courts in California and Illinois and has received partial repayment of the $2.5 million that it loaned to CityScope, but Blue Rider claims it is "still owed principal, interest and fees, in excess of $2.0 million." Amended Complaint ¶¶ 69-71 (ECF 33).

In Blue Rider's Amended Complaint (ECF 33), which is the operative pleading, Blue Rider asserts four common law counts: fraud (Count I); negligence (Count II); negligent misrepresentation (Count III); and negligent retention and supervision (Count IV).[2]  Counts I, II, and III are directed against both defendants.  Count IV is directed only against Harbor Bank.  As to Harbor Bank, Counts I, II, and III are based on vicarious liability for Dunn's torts, under the doctrine of *respondeat superior*.[3]

Harbor Bank has filed a Motion to Dismiss ("Motion") (ECF 39), pursuant to Fed. R. Civ. P. 12(b)(6), contending that the Complaint fails to state claims against Harbor Bank upon which relief can be granted.[4]  The Motion has been fully briefed, and no hearing is necessary to resolve it.  *See* Local Rule 105.6.[5]  For the reasons that follow, the Motion is denied.

## Factual Background[6]

According to the Complaint, in late February 2011, David Odom, a Chicago-based producer with CityScope, contacted Mark Campbell, a movie producer based in New York City,

---

[2] The Amended Complaint was filed on May 7, 2012, accompanied by several exhibits. *See* ECF 34.  Hereafter, I will refer to it as the "Complaint."  The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  Blue Rider is a California corporation with its principal place of business in Santa Monica, California.  Complaint ¶¶ 1, 4.  Harbor Bank is incorporated as a banking institution under Maryland law, and its principal place of business is in Baltimore, Maryland.  *Id*. ¶ 2.  *See* 28 U.S.C. § 1332(c)(1).  Dunn is also a Maryland citizen.  *Id*. ¶ 3.  The amount in controversy exceeds the jurisdictional threshold of $75,000.  *Id*. ¶¶ 6, 71.

[3] Although the heading of Count I states that it is alleged "[a]gainst Dunn," the text of the count makes clear that plaintiff seeks to hold Harbor Bank vicariously liable under Count I as well.  *See* Complaint ¶¶ 82-85.

[4] Dunn has filed an Answer to the Complaint, denying liability.  *See* ECF 40.  This Opinion does not address the viability of plaintiff's claims against Dunn.

[5] Plaintiff submitted an Opposition (ECF 45), and Harbor Bank filed a Reply (ECF 50).

[6] The facts are drawn from the Complaint and its exhibits, and are construed in the light most favorable to plaintiff.

to seek Campbell's involvement in producing a movie with the working title *Season Tickets*. Complaint ¶ 7.  Odom informed Campbell "that escrow agreements were in place at Harbor [Bank] to secure short-term financing" for the movie and invited Campbell to confirm this fact by contacting Rodney Dunn, then a Vice President at Harbor Bank, to discuss the escrow security.  *Id.*  On March 3, 2011, Campbell called Harbor Bank at the telephone number listed on its website, *id.* ¶¶ 8-9, and asked to speak to "the individual responsible for securing the escrows related to the *Season Tickets* deal."  *Id.* ¶ 10.  He was informed that he needed to speak with Mr. Dunn, and was transferred to Dunn's voice mail.  *Id.*  Campbell left a voice message and, a few minutes later, Dunn returned Campbell's call.  *Id.* ¶ 11.  Dunn informed Campbell that Harbor Bank held $8 million in escrow from an entity called Bridge Capital Corporation ("BCC") and $5 million in escrow from another entity called Shah Group, LLC ("Shah") for "the financing of *Season Tickets*."  *Id.* ¶ 12.

Around the same time, Odom was seeking short-term "bridge loan" financing for *Season Tickets*.  *Id.* ¶ 14.  Plaintiff explains that a bridge loan is a type of short-term financing that allows a movie producer to "secure the acting talent necessary to close permanent financing for a picture."  *Id.* ¶ 1.  Odom contacted Sarah Giles, the owner and operator of the United Kingdom-based finance firm Quick Draw LP ("Quick Draw"), "to discuss short-term financing options for *Season Tickets*."  *Id.* ¶ 14.  As proof of the escrow security at Harbor Bank, Odom provided Giles with several documents, including "a Letter of Credit ('LOC') … produced on Harbor [Bank] stationary [sic] and signed by Rodney Dunn."  *Id.*  In late March 2011, Quick Draw engaged the Maryland law firm of Miles & Stockbridge P.C. ("M & S") to represent it in dealing

with Harbor Bank.  Attorneys at M & S became suspicious of the LOC presented by Odom and investigated further.  *See id.* ¶¶ 16-17.

On April 8, 2011, Cynthia Collins, an attorney at M & S, sent an email to Giles informing her that the documents Odom had provided were "fraudulent."  *Id.* ¶ 20.  Collins had spoken with Harbor Bank's Chief Operating Officer, Darius L. Davis, and wrote in her email:

> "Harbor Bank has never heard of the Shah Group and they have no money on deposit at Harbor Bank.  In addition, all of the original documents which were provided to [Quick Draw] (Letter of Credit, Escrow Agreement and Confirmation of Funds) are fraudulent.  They contain the name of an actual officer of Harbor Bank [*i.e.*, Dunn], but that is not his signature.  Loan numbers were used that did not match their system and fake letterhead was used for the Letter of Credit."

*Id.* (quoting email).

Giles instructed another M & S attorney, Frederick Runge, "to communicate to Harbor [Bank] that Dunn himself had confirmed the accuracy of the LOC and the existence of the BCC and Shah accounts to secure *Season Tickets* funding."  *Id.* ¶ 21.  Plaintiff alleges, upon information and belief, that Runge communicated to Harbor Bank "that Dunn was involved with the attempted fraud."  *Id.*  On April 13, 2011, Davis emailed Runge to "[t]hank [him] for calling regarding [the] matter," and to confirm that Harbor Bank had no record of the escrowed funds.  *Id.* ¶ 22.  However, plaintiff alleges that Harbor Bank "failed to act upon this information, investigate these irregularities or remove Dunn from his job responsibilities."  *Id.* ¶ 23.

In the meantime, Campbell, the New York-based producer, was unaware of the communications between Quick Draw, its attorneys, and Harbor Bank.  *Id.* ¶ 25.  Odom told Campbell that he "was growing frustrated with Quick Draw LP because it was acting 'too slowly.'"  *Id.*  Accordingly, Campbell "became involved with attempting to find another short term investor for *Season Tickets*."  *Id.*

On April 12, 2011, Campbell approached Blue Rider to provide a $2.5 million bridge loan to help finance the film. *Id.* ¶¶ 26, 28. Campbell conveyed his understanding that Harbor Bank had $13 million in escrow to finance *Season Tickets* and secure the loan, based on his telephone conversation with Dunn. *Id.* ¶¶ 26-27. Campbell introduced officers of Blue Rider to Odom, who also represented to them that $13 million was escrowed with Harbor Bank and was "available as collateral to secure repayment of all obligations under the [contemplated Blue Rider] bridge loan to City[Scope] in the amount of $2.5 million plus fees and costs." *Id.* ¶ 28.

In preparing to make the bridge loan, Blue Rider received several written assurances from Dunn that the escrow financing was in place. *Id.* ¶¶ 29-34. Dunn, purporting to act in his capacity as Harbor Bank Vice President, signed two escrow agreements, prepared by Blue Rider's counsel, to establish the terms of the security interest in each of the two purported escrow accounts; I refer to these agreements as the "BCC Agreement" and "Shah Agreement." *See id.* ¶¶ 30, 32. These agreements recited that the BCC account and the Shah account contained $8 million and $5 million, respectively.[7] *Id.* ¶¶ 29, 31. The agreements also recognized Harbor Bank as "the bank holding and acting as custodian of" both accounts. *Id.* ¶¶ 30, 32.

According to Blue Rider, the BCC Agreement provided that, as of May 1, 2011, Harbor Bank was holding $8 million in escrow, and would release the funds to Blue Rider "if within 45 days drawing documents confirming that certain producer and director agreements had been concluded were presented to Harbor [Bank]." *Id.* ¶ 29. The Shah Agreement stated that Harbor

---

[7] A copy of the BCC Agreement was submitted as Exhibit B to the Complaint (ECF 34-1). What appears to be an incomplete copy of the Shah Agreement (it is missing the first page) was submitted as Exhibit C (ECF 34-2). The first page of the BCC Agreement provides that the parties to the agreement were BCC, Blue Rider, CityScope, and Harbor Bank.

Bank was holding $5 million in escrow, which "would be released within 45 days after [Blue Rider] advanced the $2.5 million bridge loan if the bridge loan had not been previously repaid from the BCC escrow or otherwise." *Id.* ¶ 31.  On May 6 and May 9, 2011, Dunn, purporting to act in his capacity as Harbor Bank Vice President, also signed "Available Funds Verification" documents reciting more precise values of the funds in escrow.  *Id.* ¶¶ 33-34; *see* Ex.D & E to Complaint (ECF 1-3 & 1-4).

Shortly thereafter, Blue Rider "conducted diligence related to the wiring of … $2.5 million to Odom's company, [CityScope]."  Complaint ¶ 36.  The purpose was "to confirm the veracity of the statements made by Dunn and Odom that Harbor [Bank] had escrow accounts for BCC and Shah to secure" the bridge loan.  *Id.*  In the course of Blue Rider's verification efforts, during a telephone call initiated by Dunn from Harbor Bank's main number, Dunn made several verbal assurances that $13 million in escrow funding existed to secure the $2.5 million loan.  *Id.* ¶¶ 38-47.  Dunn also "confirmed the accuracy" of "each and every term and condition" of the BCC Agreement, the Shah Agreement, and the Available Funds Verification documents.  *Id.* ¶¶ 44-47.  Additionally, "Dunn stated that he had signed the [two] Escrow Agreement[s] in his capacity as a 'Vice President' of Harbor [Bank]."  *Id.* ¶¶ 44-45.  Relying on these assurances, Blue Rider made the loan on May 9, 2011.  *Id.* ¶ 49.  The loan "was to be fully repaid within forty-five (45) days of the date of funding—on or by June 24, 2011."  *Id.* ¶ 50.

In response to phone calls, emails, and faxes from Blue Rider during the 45-day term of the loan, Dunn continued to assure Blue Rider that the escrow financing existed.  *Id.* ¶¶ 26, 55, 61, 63.  In a phone conversation on June 15, 2011, Dunn told Walter Josten, the Chief Financial Officer of Blue Rider, *see id.* ¶ 26, "that the $13 million was still in place for both the BCC and

Shah escrows." *Id*. ¶ 55.  Dunn repeated this assurance in an email sent to Josten and another officer of Blue Rider on June 16, 2011.  *Id*. ¶ 61.  During a telephone conversation on June 22, 2011, Dunn told Josten "that he (Dunn) would be wiring [Blue Rider] the money from Harbor [Bank] tomorrow."  *Id*. ¶ 63.  In a series of phone calls the next day, June 23, 2011, Dunn provided Campbell and Josten, as well as other Blue Rider officers, with purported "wire confirmation particulars" for transmission of the funds to Blue Rider.  *Id*. ¶ 65.  However, the funds were never transferred.

On June 24, 2011, after the repayment funds failed to materialize, Josten called Harbor Bank and spoke with Daryl Banks, the manager of the Harbor Bank Riverdale branch, who advised that the "BCC Escrow Account and the Shah Escrow Account Numbers did not exist at his bank."  *Id*. ¶ 67.  Only a week before, on June 15, 2011, Banks had informed Josten that "he was familiar with the BCC and Shah escrows, but that 'only Rodney Dunn' could handle these accounts."  *Id*. ¶¶ 52-53.  According to Blue Rider, Harbor Bank had known that these accounts did not exist since at least April 13, 2011, due to its earlier communication with Quick Draw and its attorneys, *see id*. at ¶ 22, but none of the Harbor Bank officials with whom Blue Rider communicated ever notified Blue Rider of those facts.  *Id*. ¶ 62.  As in Josten's communication with Banks, Renee Cannan, a Vice President of Harbor Bank and Assistant Branch Manager of the bank's Riverdale branch, had informed Blue Rider officials on May 9, 2011, that Dunn "was responsible for all of the documents relating to [the Blue Rider] deal."  *Id*. ¶ 40.

Blue Rider alleges that Dunn and CityScope colluded in a scheme of fraud.  It has recovered some of the funds it loaned to CityScope through state court actions in California and Illinois, but contends it is still owed in excess of $2 million.

**Standard of Review**

Harbor Bank's Motion arises under Rule 12(b)(6) of the Federal Rules of Civil Procedure, authorizing dismissal of a complaint that fails to state a claim upon which relief can be granted.  Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 n.3 (2007).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Id.* at 555.  But, the rule demands more than bald accusations or mere speculation.  *Id.*  To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Id.* at 556.  A complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient.  *Id.* at 555.

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *See, e.g.*, *Davani v. Va. Dept. of Transp.*, 434 F.3d 712, 720 (4th Cir. 2006). Both *Twombly*, 550 U.S. 544, and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), make clear that, in order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in Twombly expounded the pleading standard for 'all civil actions'. . . ."); *see also Simmons v. United Mortgage and Loan Inv.*, 634 F.3d 754, 768 (4th Cir.

2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). A motion pursuant to Rule 12(b)(6) typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.1999) (internal quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. Moreover, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 130 S.Ct. 1740 (2010). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citation omitted).

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, on a motion to dismiss" under Rule 12(b)(6). *Clatterbuck v. City of Charlottesville*, ___ F.3d ___, No. 12-1149, slip op. at 13, 2013 WL 632950 (4th Cir. Feb. 21, 2013). In considering a Rule 12(b)(6) dismissal, however, the court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the motion to dismiss, "so long as they are integral to the complaint and authentic." *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also E.I. du Pont de Nemours & Co.*, 637 F.3d at 448.

## Discussion

Harbor Bank advances two challenges to plaintiff's Complaint.  First, Harbor Bank's alleged liability to plaintiff with respect to Counts I, II, and III is premised on the doctrine of *respondeat superior* and, in Harbor Bank's view, the Complaint does not plead a cognizable claim under that doctrine.  Second, as to Count IV, Harbor Bank maintains that plaintiff fails to allege a basis to impose tort liability upon it for negligent retention and supervision.  I consider these arguments in turn.[8]

### A.  *Respondeat Superior*

In Counts I, II, and III of the Complaint, Blue Rider asserts claims of fraud (*i.e.*, intentional misrepresentations or omissions of material facts), negligence, and negligent misrepresentation against Dunn.  Moreover, Blue Rider contends that Harbor Bank is vicariously liable for the commission of those torts by Dunn, who was a Vice President of Harbor Bank, on the basis of *respondeat superior*.

*Respondeat superior* is the doctrine that "'an employer is ordinarily responsible for the tortious conduct of his employee committed while the servant was acting within the scope of the employment relationship.'"  *Barclay v. Briscoe*, 427 Md. 270, 282, 47 A.3d 560, 567 (2012) (quoting *Embrey v. Holly*, 293 Md. 128, 134, 442 A.2d 966, 969 (1982)).  The doctrine embodies the principle that, "[b]ecause 'the master holds out his servant as competent and fit to be trusted,

---

[8] The parties have presented their arguments under Maryland case law, without discussing the issue of choice of law.  Accordingly, I assume, without deciding, that Maryland law applies.  I note, however, that in tort cases, Maryland courts apply the law of the state where the alleged tort occurred, which in this case appears to be Maryland.  *See Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010).  *See also, e.g.*, *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (stating that a federal district court in a diversity actions ordinarily must apply the choice of law rules of the forum state, *i.e.*, the state in which the district court is located).

. . . he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment.'" *Oaks v. Connors*, 339 Md. 24, 30, 660 A.2d 423, 426 (1995) (quoting *Globe Indem. Co. v. Victill Corp.*, 208 Md. 573, 580, 119 A.2d 423, 427 (1956)).   In the context of a corporate employer, the doctrine also recognizes that corporations are "'creature[s] of legal fiction,' which are 'incapable of tortious conduct by themselves'" and "can act only by virtue of [their] agents." *So. Mgmt. Co. v. Taha*, 378 Md. 461, 479-80, 836 A.2d 627, 637-38 (2003) (citations omitted).   "On a successful claim under the doctrine of respondeat superior, an employer will be held jointly and severally liable for the tortious acts committed by its employees." *Id.* at 481, 836 A.2d at 638.

According to Harbor Bank, plaintiff fails plausibly to allege that Dunn's malfeasance was "within the scope of the employment relationship," *Embrey*, 293 Md. at 143, 442 A.2d at 969, so as to come within the doctrine.   I disagree.

"Ordinarily, the issue of whether a particular act is within the scope of employment is properly decided by a jury . . . ." *Barclay*, 427 Md. at 283, 47 A.3d at 568.   It is only where there is "'no conflict in the evidence relating to the question and but one inference can be drawn therefrom'" that the issue becomes a "'question . . . of law for the court.'" *Id.* (citation omitted). Moreover, "there are few, if any, absolutes" in assessing whether an employee's act is within the scope of employment. *Sawyer v. Humphries*, 322 Md. 247, 255, 587 A.2d 467, 471 (1991).

The general rule is that, "[f]or an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer." *Taha*, 378 Md. at 481, 836 A.2d at 638.   However, this general benchmark is not susceptible of mechanical application.   "By 'authorized' [it] is not meant

- 11 -

authority expressly conferred [by the employer], but whether the act was such as was incident to the performance of the duties entrusted to the employee by the employer, *even [if] in opposition to his express and positive orders*." *Sawyer*, 322 Md. at 255, 587 A.2d at 470 (emphasis added) (citations and some internal quotation marks omitted). "Accordingly, 'an act may be within the scope of employment, even though forbidden or done in a forbidden manner, or consciously criminal or tortious . . . .'" *Tall v. Bd. of Sch. Comm'rs of Baltimore City*, 120 Md. App. 236, 252, 706 A.2d 659, 667 (1998) (quoting *Great Atl. & Pac. Tea Co. v. Noppenberger*, 171 Md. 378, 391, 189 A. 434 (1937)).

Nevertheless, "where an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests," the actions will ordinarily be considered outside the scope of employment. *Sawyer*, 322 Md. at 256-57, 587 A.2d at 471. Moreover, "'[w]here the conduct of the servant is unprovoked, highly unusual, and quite outrageous,' courts tend to hold 'that this in itself is sufficient to indicate that the motive was a purely personal one' and the conduct outside the scope of employment." *Id.* at 257, 587 A.2d at 471 (citation omitted). In this connection, "an important factor is whether the employee's conduct was 'expectable' or 'foreseeable'" to the employer. *Id.* at 256, 587 A.2d at 471 (quoting *Cox v. Prince George's County*, 296 Md. 162, 171, 460 A.2d 1038, 1042 (1983)).

In *Noppenberger*, the Maryland Court of Appeals enumerated a host of factors that apply to ascertain whether an employee's conduct may be considered within the scope of employment:

> (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if

- 12 -

within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal.

*Noppenberger*, 171 Md. at 390-91, 189 A. 434 (citations and internal quotation marks omitted);

*accord Sawyer*, 322 Md. at 256, 587 A.2d at 471; *Tall*, 120 Md. App. at 253, 706 A.2d at 668.

In the posture of a motion to dismiss, consideration of the *Noppenberger* factors does not favor Harbor Bank. Dunn's alleged tortious conduct was the facilitation of a loan transaction, an act that certainly may have been within the ordinary scope of responsibility of a bank vice president. The acts apparently were performed by Dunn during business hours at his office at Harbor Bank. There is no indication that Dunn was a recent hire. Other employees of Harbor Bank specifically stated to Blue Rider that Dunn, and only Dunn, was authorized to handle the transaction. The financial transaction at issue came within the enterprise of banking. Harbor Bank had reason to believe that Dunn was engaged in the fraudulent scheme, because it had been alerted to the scheme by Quick Draw. Dunn's actions seemingly were of a type he would have undertaken in the course of his ordinary business, as authorized by Harbor Bank. The "instrumentality by which the harm was done" was Dunn's title as vice president of Harbor Bank, and Harbor Bank's offices and communications infrastructure, all of which were "furnished by [Harbor Bank] to [Dunn]." *Id.* at 391. Harbor Bank points to no apparent "departure from the normal method of accomplishing an authorized result." *Id.* The only *Noppenberger* factor that weighs in Harbor Bank's favor is that Dunn's alleged actions most likely were criminal. But, as the *Noppenberger* Court observed, "an act may be within the scope of employment, even though forbidden or done in a forbidden manner, or consciously criminal or

tortious." *Id.*

In contending that Dunn's alleged misconduct fell outside the scope of employment, Harbor Bank relies on *Young v. FDIC*, 103 F.3d 1180 (4th Cir. 1997), and *Day v. DB Capital Group, LLC*, Civ. No. DKC-10-1658, 2011 WL 887554 (D. Md. Mar. 11, 2011).  In *Young*, applying South Carolina law, the Fourth Circuit held that *respondeat superior* did not apply to render a bank, HHB&T, vicariously liable for the alleged torts of one of its vice presidents.[9]  The plaintiff in *Young* had "attempted to raise $600 million to finance gas and oil investments" and, "[w]hen the proposed financing failed, [he] sued those involved in the financing arrangement." *Young*, 103 F.3d at 1183.  The financing arrangement was complex, and there were several defendants but, as relevant here, the plaintiff alleged that he entered into a loan agreement only because "Mark Feaster, an HHB&T vice president, allegedly indicated" to the plaintiff's financial advisor that the loan would be secured by "$12 million on deposit with HHB&T under a Trust Deposit Agreement." *Id.* at 1184-85.  However, when the loan defaulted, HHB&T "refused to pay." *Id.* at 1185.  Feaster and HHB&T denied having executed the alleged Trust Deposit Agreement. *Id.*  The plaintiff brought fraud and conspiracy claims against HHB&T on the basis of *respondeat superior* liability for Feaster's alleged misrepresentations.

The district court granted summary judgment to HHB&T on the basis that the plaintiff had failed to support essential substantive elements of his claims. *See id.* at 1190.  The Fourth Circuit affirmed, but on the alternative ground that, "[r]egardless of whether Young established the required elements as to Feaster," he "failed to provide any evidence that Feaster acted within

---

[9] By the time of the Fourth Circuit's decision, HHB&T was under the receivership of the FDIC, and so the FDIC was the named defendant, standing in the shoes of HHB&T in its capacity as receiver. *See Young*, 103 F.3d at 1185 & n.2.  I refer to the defendant as "HHB&T" for ease of reference.

the scope of his employment." *Id.*  The Fourth Circuit observed that, under South Carolina law,

"[i]f the employee acted for some independent purpose of his own, the conduct falls outside the

scope of his employment." *Id.*  It said, *id.*:

> In the instant case, no evidence suggests that Feaster acted with the
> purpose of benefiting HHB&T even incidentally.  Indeed, if we accept Young's
> allegations as true, the evidence suggests instead that Feaster acted to further his
> conspiracy with [other codefendants] and to benefit his own independent purpose
> of defrauding Young. Young conceded as much at oral argument. Feaster,
> therefore, did not act within the scope of his employment, and the FDIC, as
> receiver for HHB&T, cannot be held liable for his conduct.

Chief Judge Chasanow reached a similar conclusion in *Day*, upon consideration of

motions to dismiss for failure to state a claim.  In that case, the plaintiff, Day, owned several

rental properties.  He fell behind on the mortgage payments for the properties and was unable to

refinance due to poor credit.  *Id.* at *2.  Day fell victim to a "foreclosure rescue scam," operated

by an entity called DB Capital, by which the victims would be stripped of title to their real estate

and "'some if not all of [their] equity.'"  *Id.* at *1 (citation omitted).

Day heard a radio advertisement for DB Capital, in which DB Capital "offered to assist

individuals having problems with bad credit and refinancing to save their properties."  *Id.* at *2.

He was prompted by the radio advertisement to contact DB Capital, and he spoke with Pettiford,

a representative of DB Capital, who was also a Vice President of Millennium Bank.  *Id.*

Pettiford initially met with Day at one of Day's properties and later met with Day at Pettiford's

Millennium Bank office.  *Id.*   Day was provided a business card with Pettiford's title at

Millennium Bank.  *Id.*  Pettiford "indicated that Millennium Bank … and DB Capital were the

same or related entitles."  *Id.*  Pettiford explained that if Day would transfer title for three of

Day's rental properties to DB Capital then DB Capital would "assign[ ] a credit investor to

purchase [Day's] property for a one-year period to allow [Day] to repair his credit and repurchase the property with a low interest rate loan after twelve months." *Id*. Day did so. An employee of Wachovia Bank, Murrell, *id.* at *19, served as one such "credit investor" and also "set up direct debits from [Day's] personal account with Wachovia Bank into the DB Capital account at Wachovia Bank for the rental payments on the properties." *Id*. at *3. In fact, Day was never given an opportunity to repurchase. *Id*. The rental properties fell into foreclosure after DB Capital "failed to make the required mortgage payments." *Id*. Day sued Millennium Bank and Wachovia Bank on the basis of *respondeat superior* liability for the torts of Pettiford and Murrell.

Judge Chasanow granted motions to dismiss filed by Wachovia Bank and Millennium Bank, ruling that Day had "not alleged sufficient facts to maintain negligence claims against Wachovia or Millennium Bank under a *respondeat superior* theory." *Id*. at *21. In support of his assertion of *respondeat superior* liability, Day had alleged only that Murrell and Pettiford "conducted acts relating to the DB Capital foreclosure rescue scam from [the bank] offices … during business hours," and included a conclusory assertion that Murrell "was acting within the scope of his employment with Wachovia." *Id*. The *Day* Court described such pleadings as "the sort of 'naked assertion devoid of further factual enhancement' or 'formulaic recitation of the elements of a cause of action' that is not permissible." *Id*. (quoting *Iqbal*, 550 U.S. at 668). Additionally, Day's pleadings "contain[ed] no allegations that the banks were aware of Mr. Murrell or Mr. Pettiford's participation in the scheme" or that the banks in any way supervised the conduct. *Id*. at *22.

Blue Rider posits that *Young* and *Day* are distinguishable on their facts and, in the case of *Young*, in regard to the procedural posture.  According to Blue Rider, the plaintiff in *Day* alleged only that the individual defendants undertook some of their tortious conduct while at their offices at the banks.  In *Young*, after discovery the plaintiff advanced "no evidence suggest[ing] that Feaster acted with the purpose of benefiting HHB&T even incidentally."   103 F.3d at 1190.  Here, in contrast, Blue Rider contends that "Harbor [Bank] through its actions affirmatively couched Dunn with the authority to consummate [the] deal."  Opposition at 10.  Under the facts alleged, Dunn not only performed his actions from his Harbor Bank office, he purported to act in his capacity as an officer of Harbor Bank.  Moreover, "Dunn was plainly authorized to negotiate escrows," *id.* at 3, and Dunn's co-workers were aware of the supposed escrow accounts and specifically acknowledged Dunn's authority over the accounts.  *See* Complaint ¶¶ 40, 52-53.  Thus, plaintiff reasons, Dunn was not merely "moonlighting," as in *Day* and *Young*, but was "actually *fulfilling his job responsibilities* as an escrow agent" in perpetrating the fraud.  Opposition at 10 (emphasis in original).  Furthermore, Blue Rider argues that it would be premature, at the pleading stage and before any opportunity for discovery, to conclude as a matter of law that Day was "just a 'rogue' employee whose actions did not benefit" Harbor Bank.  *Id.*

In light of the procedural posture of this case, which differentiates it from *Young*, and the more expansive factual allegations in this case than in *Day*, I agree with plaintiff that it has pled sufficient facts to withstand dismissal on the basis of scope of employment.  I find guidance in a

recent decision of the Maryland Court of Special Appeals that is closely on point: *Fidelity First Home Mortgage Company v. Williams*, 208 Md. App. 180, 56 A.3d 501 (2012).[10]

Fidelity First was a mortgage brokerage that employed several loan officers.  *See id.* at 185-86, 56 A.3d at 504.  One of its loan officers, Fox, along with a former Fidelity First loan officer named Dan, began operating a foreclosure rescue scam not unlike the one alleged in *Day*. *See id.* at 187-88, 56 A.3d at 505.  As the *Fidelity First* Court explained, *id.*:

> The transactions followed the same basic pattern.  Fox identified distressed homeowners who were unable to qualify for traditional mortgage refinancing due to poor credit, but who owned equity in their homes.  He and sometimes Dan advised these homeowners that they could assist them in refinancing their mortgages by using Fox's or Dan's own credit.  The homeowners were convinced that they could avoid losing their homes to foreclosure by selling their homes to Fox, Dan, or a straw buyer, but remaining in the properties as tenants.  This purportedly would allow the homeowners to rehabilitate their credit ratings and eventually buy back their houses at a more favorable mortgage loan interest rate. ([H]owever, the homeowners may or may not have understood that they were selling their homes.)  Fox and Dan promised to pay the mortgages on the properties for six months to a year, at which time the homeowners would be able to re-acquire title to their properties.
>
> To facilitate the property purchases, Fox, Dan, or a straw buyer would apply for and obtain mortgage loans in their own names.  In at least three of the transactions, Fidelity First was the mortgage broker. . . .  In each transaction, the borrower [*i.e.*, Fox, Dan, or the straw buyer] represented that he or she would make a cash down payment, and the mortgage loans only covered a portion of the purchase price.  In fact, . . . the seller's own proceeds from the sale of the property were used to cover the cash down payment.  Fox and Dan pocketed the remaining proceeds. . . .  Ultimately Fox [and Dan] did not pay on the mortgage loans and they went into default.

Fox and Dan were ultimately indicted in federal court for their conduct in the scheme, and each pleaded guilty to wire fraud and conspiracy to commit wire fraud.  *See id.* at 192-93, 56 A.3d at 508.  One of the victims of the fraud scheme, Williams, sued Fidelity First civilly,

---

[10] *Fidelity First* was decided after briefing of the Motion was completed, but neither side submitted a notice of recent authority calling the case to the Court's attention.

asserting (among other things) vicarious liability for Fox's role in the scheme under a theory of *respondeat superior*.  *See id.*  The case was tried to a jury, which returned a verdict for the plaintiff.  *Id.* at 196, 56 A.3d at 510.

On appeal, the Maryland Court of Special Appeals affirmed.  With respect to Williams' *respondeat superior* claim, the court said: "Viewing the evidence at trial in the light most favorable to Williams, we conclude that a reasonable juror could find that Fox was acting within the scope of his employment when he perpetrated the fraudulent scheme against Williams."  *Id.* at 204, 56 A.3d at 515.  The court cataloged the facts elucidated at trial that led it to its conclusion, including the following:

> Williams came into contact with Fox because Fidelity First solicited her. [In] February 2006 [Fidelity First sent Williams a] solicitation letter [that] informed her that she had been "pre-approved" for a mortgage loan with a "lower interest rate."  These representations were false.  In response to the solicitation letter, Williams called Fidelity First and an unknown employee "took [her] information."  She later received a return call from Fox.  It is plain that this initial contact with Williams was within the scope of Fox's employment with Fidelity First.

> Thereafter, Williams "told [ ] Fox about [her] situation" and he told her "he could help [ ] with refinancing" her mortgage.  Her testimony made clear that she believed that she was obtaining a refinance loan through Fidelity First, not participating in a side transaction with Fox and Dan whereby she would sell her house to Dan.

> \*   \*   \*

> The foreseeability of Fox's conduct also informs our analysis. Here, Eubanks [who was Fox's supervisor and the owner of Fidelity First] had reason to expect that Fox was engaging in foreclosure rescue transactions because Fox had discussed his "side business" with Eubanks and informed him that it was extremely profitable.  There was evidence from which the jurors could infer that Eubanks had knowledge of, tolerated, and even participated in forgery so long as the end result was that the loans closed, thereby generating fees for the company.

Similarly, the fraud alleged here began with Blue Rider calling Harbor Bank and asking to speak with the person responsible for the *Season Tickets* escrows; plaintiff was directed by a

Harbor Bank employee to speak with Dunn.  Virtually all of plaintiff's communications with Dunn appear to have occurred via phone calls or emails to or from Harbor Bank's telephone number and Dunn's email account at Harbor Bank.  There was no indication that Dunn was engaged in a "side transaction"; Dunn represented that the escrow accounts were held by Harbor Bank, and purported to execute the escrow agreements on behalf of Harbor Bank, in his capacity as a Vice President of Harbor Bank.  Dunn's supervisors and co-workers were aware that Dunn was conducting business concerning the escrow accounts.  Indeed, plaintiff alleges that Harbor Bank knew or should have known of Dunn's fraudulent conduct because it had been alerted to the allegations of fraud by Quick Draw.

To be sure, there was also additional evidence presented at trial in *Fidelity First*, as to which Blue Rider has not alleged analogous facts.  In particular, Blue Rider has not alleged facts that would show a *direct* benefit to Harbor Bank resulting from the alleged fraud scheme.

To illustrate, part of the fraud scheme in *Fidelity First* involved Fox, Dan, or straw purchasers actually obtaining new mortgages through Fidelity First.  *See id.* at 205-06, 56 A.3d at 515-16.  This fact not only increased the visibility to Fidelity First (and hence, foreseeability) of the conduct of Fox and Dan, but also resulted in additional income for Fidelity First, in the form of origination fees.  *See id.*  Moreover, Fox testified that he "sought out distressed buyers to participate in his and Dan's foreclosure rescue scheme in part to . . . increase his closing rate in his position with Fidelity First."  *Id.* at 206, 53 A.3d at 516.  Thus, the Court of Special Appeals reasoned, "a reasonable juror could infer that Fox's foreclosure rescue scheme, while in furtherance of his own interests, also was incidental to the performance of his job duties and in furtherance of Fidelity First's interest in closing loans."  *Id.*

However, this case is only at the pleading stage.  Evidence that is more strongly suggestive of a benefit to Harbor Bank may emerge in discovery.  At this juncture, Blue Rider has articulated sufficient facts that the Court cannot say, as a matter of law, that Dunn's alleged conduct was outside the scope of his employment—an issue that, as I have explained, is ordinarily a question for the fact finder.  *See, e.g.*, *Barclay*, *supra*, 427 Md at 283, 47 A.3d at 568.

As noted, a Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, *supra*, 556 U.S. at 679 (citation omitted).  The plaintiff's task in framing its complaint is to "nudge[ ] [its] claims across the line from conceivable to plausible." *Twombly*, *supra*, 550 U.S. at 570.  "The plausibility standard is not akin to a 'probability requirement'"; it simply "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  As I see it, comparison of plaintiff's allegations to those held sufficient in *Fidelity First* indicates that plaintiff has cleared the bar of Rule 12(b)(6).[11]

Comparison to cases in other jurisdictions further supports this conclusion.  In *FSC Security Corp. v. McCormack*, 630 So. 2d 979 (Miss. 1994), the Missouri Supreme Court ruled that employee fraud was outside the scope of employment for the purposes of *respondeat*

---

[11] In my view, this case and *Fidelity First* are distinguishable from *Young* and *Day.* Moreover, in *Young* the Fourth Circuit applied South Carolina law, not Maryland law.  And, the Maryland Court of Special Appeals speaks with authority as to Maryland law, except to the extent that its decisions are overruled by the Maryland Court of Appeals.  If that court "has not spoken on [an] issue, '[the] intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court *unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.*'" *Proctor v. WMATA*, 412 Md. 691, 704, 990 A.2d 1048, 1055 (2010) (quoting *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)) (emphasis in *Proctor*).

*superior*, but on facts clearly distinguishable from the case at bar.  In that case, Manuel was a registered representative of FSC, a securities brokerage.  *Id.* at 980.  However, like all other such representatives at FSC, Manuel was "by the terms of his contract agreement … an 'independent contractor,'" and had generated less than $1,000 in commissions over the course of 3.5 years working for FSC.  *Id.* at 980-81.  Manuel's main business enterprise was Financial Services Limited, a company through which he "sold and marketed limited partnerships to the unsuspecting public, ostensibly for the purpose of investing in radio stations."  *Id.* at 980.  The McCormacks sought out Manuel as a financial advisor.  At their initial meeting, Manuel provided a business card that "had the name Financial Services Limited in the upper left corner, Manuel's [sic] name in the center, and the words 'Registered Representative FSC Securities Corporation …' along the bottom in small print."  *Id.* at 982.  The McCormacks later gave Manuel "a check for $150,000 made payable to Financial Services Limited," *id.*, to be invested in bonds and an IRA account.  *Id.* at 983.  Although Manuel did place the McCormacks' money "in the Financial Services Limited checking account," the money was not invested according to the McCormacks' intended wishes.  *Id.* at 984.  Rather, the money was used "to provid[e] 30 to 120 day 'bridge loans' to Manuel's radio stations" and "finance, among other things, a sailboat and two new Mazda automobiles."  *Id.* at 985.  Manuel was found guilty of tortious conversion.  *Id.* at 979.

The Supreme Court of Mississippi held that there was no *respondeat superior* liability against FSC because Manuel was acting outside the scope of his employment at FSC when he converted the McCormacks' money.  The record contained "no evidence … that FSC Securities had any knowledge of Manuel's unauthorized activities."  *Id.* at 985.  Manuel "explicitly stated

in his receipt that he accepted the funds from them as an agent for Financial Services Limited rather than FSC Securities." *Id*. at 986.  The McCormacks "had no contact with FSC, made no effort to follow their investment through FSC and relied on and dealt only with Manuel." *Id*. Additionally, FSC representatives were found to "act within the scope of employment only when soliciting or transacting business in securities approved for sale by the broker-dealer." *Id*. Manuel's investments had no such approval.  Ultimately, because FSC "had no knowledge of [Manuel's] activities," FSC could not be held vicariously liable. *Id*. at 988.

Blue Rider has pleaded facts analogous to those that the *McCormack* Court found missing.  Blue Rider has alleged that Harbor Bank was aware of Dunn's activity.  Complaint ¶¶ 40, 52-53, 55, 59-60.  Plaintiff also recounts that Blue Rider contacted Harbor Bank several times regarding the loan.  *Id*.  Dunn did not act in connection with a side business; he held himself out as an agent of Harbor Bank in the transactions at issue, and allegedly was authorized by Harbor Bank to act as an escrow agent, performing the very work that was carried out in perpetrating the fraud. *Id*. at 40, 52-53.

The Supreme Court of Virginia has "expressly reject[ed]" the requirement "that *the specific act which caused the injury* be performed by the employee with an intent to benefit the employer" to be considered within the scope of employment.  *Gina Chin & Associates, Inc. v. First Union Bank*, 537 S.E.2d 573, 577 (2000) (emphasis added).  In *Chin*, an accounts payable clerk issued checks from her firm's business account to herself.  She then had these checks deposited into her personal account at First Union Bank.  *Id*. at 574-75.  These business checks could be deposited into her personal account because a teller at First Union was deliberately breaking First Union policy in helping her to do so.  *Id*. at 574.  The clerk's firm eventually

discovered the fraud and sued First Union for negligence, on the basis of *respondeat superior*. *Id*. at 575.  The Supreme Court of Virginia held that the evidence "was sufficient to establish a jury issue whether [a bank teller] acted within the scope of his employment" and that the issue "did not lend itself to a resolution as a matter of law by the trial court."  *Id*. at 579.  The court acknowledged that the teller "was acting out of self-interest … and his conduct was 'outrageous and violative of his employer's rules.'"  *Id*. at 579 (citation omitted).  Nevertheless, the teller was also "performing a normal function of a bank teller in accepting the checks for deposit."  *Id*.

In this case, Dunn had specific authority to oversee escrow agreements, and his performance of that job requirement was generally beneficial to Harbor Bank.  Complaint ¶¶ 40, 52-53.  The Maryland Court of Appeals has stated that "[t]o be within the scope of the employment the conduct must be of the kind the servant is employed to perform … and *actuated at least in part* by a purpose to serve the master" or "*incidental* to the conduct authorized." *Sawyer*, 322 Md. at 255-56, 587 A.2d at 471 (citations omitted) (emphasis added).  Here, Dunn allegedly was fulfilling his job requirements with the full endorsement of his superiors during the commission of the fraud.  Complaint ¶¶ 40, 52-53.  Dunn's actions were more than "incidental to the conduct authorized."  *Sawyer*, 322 Md. at 255-56, 587 A.2d at 471 (quotations omitted).

For all of the foregoing reasons, Harbor Bank's Motion will be denied with respect to Counts I, II, and III.

## B.  Negligent Retention and Supervision

In Count IV, plaintiff asserts the tort of negligent retention and supervision.  The essence of the duty encompassed by that tort was expressed by the Maryland Court of Appeals in *Evans v. Morsell*, 284 Md. 160, 166, 395 A.2d 480, 483 (1978) (citation omitted):

"One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment."

Harbor Bank asks the Court to reject Count IV, arguing that Blue Rider's relationship with Harbor Bank was too attenuated to justify recognition of tort liability.  Motion at 13-15. Specifically, Harbor Bank argues that, as a general rule, banks do not owe a duty of care to non-customers, and there was no "intimate nexus" between Harbor Bank and Blue Rider to create such a tort duty where the plaintiff suffered only financial damages.  *Id.* at 15; *see Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986); *Nat'l Union Fire Ins. Co. v. Allfirst Bank*, 282 F. Supp. 2d 339, 345 (D. Md. 2003) (""[A] bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship."") (quoting *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002)).  This claim, too, must fail.

In Maryland, "[w]here the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability."  *Jacques*, 307 Md. at 534, 515 A.2d at 759. This doctrine is sometimes called the "economic loss rule."  *See, e.g.*, *Farmers Bank of Md. v. Chicago Title Ins. Co.*, 163 Md. App. 158, 172, 877 A.3d 1145, 1153 (2005).

The "intimate nexus" that allows a plaintiff to avoid the bar to recovery of the economic loss rule "is satisfied by contractual privity or its equivalent."  *Jacques*, 307 Md. at 534-35, 515 A.2d at 759-60.  Courts have found "privity and an 'intimate nexus' as a result of the expectation and knowledge of reliance by the plaintiff."  *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, ____ Md. ____, 2013 WL 322663, at *8 (Md. Jan. 29, 2013).  Notably, the Maryland Court

of Appeals has held that an "intimate nexus" can exist between a bank and a non-customer. *See Chicago Title Ins. Co. v. Allfirst Bank*, 394 Md. 270, 288 n.11, 905 A.2d 366, 376 n.11 (2006) ("We disagree with [the] contention that [*Messing*] stands for the proposition that a depositary bank has no duty to … a 'non-customer and a stranger to the Bank.'") (quoting *Messing v. Bank of Am., N.A.*, 373 Md. 672, 691, 821 A.2d 22, 33 (2003)).   Indeed, in *Jacques*, a touchstone Maryland case on the economic loss rule, the court found an "intimate nexus" between loan applicants and a bank where "the relationship between these parties … left the [applicants] particularly vulnerable and dependent on the Bank's exercise of due care" and "[t]he Bank was well aware of the nature of its obligation." *Jacques*, 307 Md. at 540-41, 515 A.2d at 762.

The Maryland appellate courts have found an intimate nexus supporting tort liability in relationships similar to that which is alleged in this case.  In the Maryland Court of Appeals's recent decision in *Columbia*, the Court held that such a relationship existed between a title company and a real estate purchaser that was not its client, where "the Title Companies knew that the [purchaser] would rely on the title commitment [and] the [purchaser's] reliance on the information in the commitment … was an aim of the title insurance transaction." *Id*. at *12.  In *Chicago Title*, *supra*, 394 Md. 270, 905 A.2d 366, the court held that an intimate nexus existed where a bank received a check from a title company that was not its customer, for the purpose of retiring a mortgage debt on real property owned by a customer of the bank, but the bank allowed the customer to deposit the check into the customer's own account, rather than apply the check to the mortgage loan. *Id*. at 278, 905 A.2d at 370.  An "intimate nexus" also existed between two parties with no contractual relationship where a defendant accounting firm "knew that the [plaintiffs] had relied on information supplied by [the firm] in deciding to lend monies to, or

securing loans" for the accounting firm's client.  *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 693, 762 A.2d 582, 608 (2000).

In this case, the allegations are sufficient as to an "intimate nexus" between Harbor Bank and Blue Rider because, under the facts alleged by plaintiff, Harbor Bank knew that Blue Rider would rely on Dunn's representations that the escrow agreements were in place and that Dunn was authorized to handle them.  "[D]raw[ing] all reasonable inferences in favor of the plaintiff," *E.I. du Pont*, *supra*, 637 F.3d at 440, the Court must accept as true the allegations that Dunn held himself out as a representative of Harbor Bank.  Complaint ¶¶ 33-34, 43-47.  Cannan and Banks both confirmed Dunn's authority over these accounts before the loan was made.  *Id.* ¶ 40.  Blue Rider's loan to CityScope was contingent on Dunn's assurances of the validity of the escrow agreements.  Dunn and several other Harbor Bank employees spoke *directly* with Blue Rider officials on several occasions.  Based on plaintiff's averments, a fact-finder could conclude that Harbor Bank should have known that Blue Rider would rely on the existence of the promised funds in making the loan.  The alleged facts, and the reasonable inferences drawn from them, support the existence of an "intimate nexus" based on Harbor Bank's "expectation and knowledge of reliance by" Blue Rider.  *Columbia*, 2013 WL 322663 at *8.  Moreover, under the facts alleged by plaintiff, it was foreseeable to Harbor Bank that Dunn would attempt to defraud Blue Rider because the bank had already been placed on notice of the fraudulent scheme by Quick Draw.  *See Fidelity First*, *supra*, 208 Md. App. at 200, 56 A.3d at 513 (affirming judgment against mortgage brokerage for negligent retention and supervision of employees engaged in fraudulent foreclosure rescue scheme where owner of brokerage was aware of several occasions on which employees had forged documents).

- 27 -

In *Jacques*, the Court articulated another justification for imposition of a tort duty to a non-customer that is particularly relevant to the banking context, and thus is salient here. This justification arises from the "nature of the banking industry and its relation to public welfare." *Jacques*, 307 Md. at 543, 515 A.2d at 764. In Maryland, "the business of the party upon whom the burden is sought to be imposed" is "relevant to the determination of whether to recognize the existence of a tort duty." *Id.* at 541, 515 A.2d at 763. The *Jacques* Court explained: "Traditionally banks and their officers have been held to a high degree of integrity and responsiveness to their calling." *Id.* at 542, 515 A.2d at 763. According to the *Jacques* Court, this duty applies to state banks in Maryland, because

> in Maryland a state bank may not be chartered until there has been an investigation by a state official and a determination that "[t]he character, responsibility, and general fitness of the incorporators and directors named in the articles command confidence and warrant belief that the business of the proposed commercial bank will be conducted honestly and efficiently . . . and [that] [a]llowing the proposed commercial bank to engage in business . . . [w]ill promote public convenience and advantage. . . ." Furthermore, each director of a commercial bank is required by [statute] to take an oath "to perform diligently and honestly the duties of the office."

*Id.* at 542-43, 515 A.2d at 764 (citations omitted). The heightened obligation of a bank to deal scrupulously and carefully with the public provides another justification to recognize a duty on the part of a bank toward a non-customer who deals with the bank to exercise due care in retaining and supervising employees.

Finally, Harbor Bank argues that dismissal is warranted because, "[a]ssuming *arguendo* that the escrow agreements were not fraudulent or that they otherwise provided some type of limited relationship," the BCC Agreement and the Shah Agreement both "provided that the only expectation was a limited contractual duty [that] expressly disclaimed any supposed tort duty."

Motion at 16.  I need not consider this purported contractual waiver of tort liability.  Harbor

Bank also emphasizes that the "escrow agreements were falsified . . . and the agreements thus

could not create any duties for Harbor Bank—contractual or otherwise."  *Id*. at 16 n.6.  Blue

Rider agrees that the escrow agreements "were false and untrue."  Complaint  ¶¶ 35, 62.  Where

both parties agree that there was no binding contract, any purported waiver contained in the

fraudulent contract has no effect.

### Conclusion

For the foregoing reasons, Harbor Bank's Motion will be denied.  An Order consistent

with this Memorandum Opinion follows.


Date:  March 22, 2013                    _____/s/_____
                                         Ellen Lipton Hollander
                                         United States District Judge